Filed 1/6/16  P. v. Lugo CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>EDWIN LUGO,<br><br>        Defendant and Appellant. | B257897<br><br>(Los Angeles County<br>Super. Ct. No. LA071580)<br><br>ORDER MODIFYING OPINION<br>(NO CHANGE IN THE JUDGMENT) |

THE COURT:

It is ordered that the opinion filed herein on December 31, 2015, be modified in the following manner:

On page 1, the judge's name in the second line shall now read:  Martin Larry Herscovitz, Judge.

This modification does not constitute a change in the judgment.

NOT TO BE PUBLISHED.

_____
ROTHSCHILD, P. J.          JOHNSON, J.          LUI, J.

Filed 12/31/15  P. v. Lugo CA2/1 (unmodified version)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>EDWIN LUGO,<br><br>      Defendant and Appellant. | B257897<br><br>(Los Angeles County<br>Super. Ct. No. LA071580) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Larry Martin Herscovitz, Judge.  Affirmed with directions.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

Edwin Lugo appeals from the judgment of conviction for two counts of first degree murder. He claims that the trial court violated his federal Sixth Amendment right to confront witnesses, his due process right to present a defense, and his state law right to impeach witnesses when it precluded him from cross-examining a prosecution witness about the witness's misdemeanor conduct. Lugo also complains that the sentencing minute order does not correctly reflect the oral pronouncement of the sentence. As we shall explain, only Lugo's claim with respect to the minute order has merit. Accordingly, we affirm the judgment and direct the trial court to correct the minute order.

## FACTUAL AND PROCEDURAL BACKGROUND

Jamie Polino, Mario Martinez, Juan Romero and Lugo worked on construction projects for MC Construction in the San Fernando Valley. Romero, who Lugo had known for years, had gotten Lugo the job with the construction company which was owned by Mauricio Cruz.

A.    *The Crimes*

At approximately 11:00 p.m., on June 2, 2012, Los Angeles police officers discovered the dead bodies of Jaime Polino and Mario Martinez in a Panorama City apartment. The men had been shot in the head at close range that day apparently between 4:30 p.m. and 5:30 p.m. Police also found guns, ammunition, street gang paraphilia, cocaine and indicia of narcotics sales inside the ransacked apartment.

Detectives interviewed residents of the apartment complex. A neighbor, Irma Lopez, reported that on June 2, between 10:30 a.m. and 11:00 a.m., an unidentified woman mistakenly opened the front door of her apartment. Ms. Lopez observed the woman, and a man, later identified as Lugo, walk to the victims' apartment, knock on the door and then enter. Approximately an hour later the apartment manager saw the victims and Lugo, and an unidentified man and woman, inside the apartment.

Ms. Lopez also told police that at sometime between 4:30 p.m. and 5:30 p.m. on June 2, she was in the apartment directly below the victims' apartment when she heard a loud bang and then the sound of something heavy falling to the floor inside the victims'

2

apartment. Another neighbor reported that at approximately 5:30 p.m., he saw Lugo and a woman leaving the victims' apartment and drive away in Polino's car.

Video surveillance film obtained from a CVS store in Los Angeles showed that at approximately 9:30 p.m. on June 2, 2012, Lugo drove Polino's car in the store's parking lot. Lugo's fingerprints were on a CVS receipt found in the car. The DNA from a beer can found in the victim's apartment connected Lugo to the crime scene.

B.    *Romero's Statements to Police*

Six weeks after the murders, police arrested Lugo's friend Romero for possession of a firearm. Romero, a known gang member and a felon, told officers that he had some information about the murders of Polino and Martinez. Detectives questioned Romero three times over the course of several hours.[1]

During the first interview, Romero claimed that he had left his gang but obtained the gun in his possession only for the protection of his wife and daughter. At first, Romero said that he acquired the gun from someone who lived in the "projects," but later said Mauricio Cruz had given him the gun. Romero also told investigators that the victims stole appliances from construction sites and resold them. Romero admitted he had been involved in those activities.

Romero told one of the investigators he believed that another employee of MC Construction, Joel Alvaro was involved in the murders because Alvaro (who was related to one of the victims), had left town immediately after the crimes; he thought that Alvaro had set-up the victims. Romero also reported that he had heard that the killings were gang-related and connected to the victims' drug dealings. Romero said he had spoken to Lugo about the murders and that Lugo denied any involvement in the crimes.

During the second interview, Romero stated that he spoke with Lugo after the murders and Lugo told him that "something happened." In the third interview, Romero said that Lugo attempted to explain Lugo's involvement in the shooting, but Romero stopped him because Romero feared he would be killed for introducing Lugo to Mauricio

---

[1]    The interviews were recorded and the recordings were played for the jury during the trial.

Cruz. Although Romero at first maintained that Lugo had not confessed to the murders, he eventually changed his story. He stated that Lugo had admitted that he was inside the victims' apartment but Lugo claimed that the woman told him that the victims were going to kill him. According to Romero, Lugo said "it was me or them." Romero explained that Lugo said "it happened" and "they're dead," and that "they had a gun at his head."

C.     *Trial Proceedings*

Lugo was arrested and charged with two counts of first degree murder (Pen. Code, § 187, subd. (a)). The information further alleged that Lugo personally and intentionally used a firearm which caused great bodily injury and death (Pen. Code, § 12022.53, subds. (b), (c) & (d)), and the special circumstance of multiple murders.

Prior to the preliminary hearing the prosecution provided Lugo's counsel with a list of Romero's prior convictions, which included: 2003 and 2012 felony convictions for possession of a firearm by a felon; 2005 misdemeanor convictions for domestic violence and criminal threats; and a 2000 misdemeanor conviction for vandalism. Several months later, on the first day of trial, Lugo's counsel sought an order allowing him to impeach Romero with his prior convictions. The court indicated that it would allow counsel to impeach Romero with his 2012 felony conviction for possession of a firearm by a felon. When Lugo asked whether he could also impeach Romero with his three misdemeanor convictions, the following exchange occurred:

> "The Court:   Well, I mean, we're going to be talking to the witness—because it's not the impeachment. It's the conduct for the misdemeanor offenses. Then we're going to have to ask, 'Mr. Romero, is it true you battered your wife or girlfriend or threatened her in 2005?' Let's assume he says, 'No.' Where do you go from there?
>
> [Lugo's Counsel]:  I'd have to bring in the police officer.
>
> The Court:  No, you wouldn't bring in the police officer. The victim. . . . Do you have the victim under subpoena? Do you even have the police reports on it?

4

[Lugo's Counsel]: I don't because the prosecution did not provide and I did not ask. I still have time to do those things. I can always attempt to do those things. They are misdemeanors. So I understand what the court is saying, but—

The Court: What I'm saying is, it will, in my opinion, cause an undue consumption of time to get into an argument about ten-year-old misdemeanor conduct between Mr. Romero and his girlfriend[/]cohabitant of ten years ago, with witnesses who may or may not be available other than Mr. Romero, who's going to be testifying, especially considering the fact that he's going to be impeached with a very recent felony of being in possession of a firearm, where, then, the jury will know that he has at least two felonies, one that made him ineligible and one that makes him guilty. I'm going to exercise my discretion and keep out the misdemeanor conduct from 2004 and 2005.

[Lugo's Counsel]: All three of them that I just requested?

The Court: Yes, since they're hearing about two felonies and they're of much more recent origin."

Shortly thereafter Lugo's counsel asked to put on the record that she had discussed with Lugo if he would be "willing to waive time" to allow counsel to locate the witnesses to the misdemeanor conduct. Counsel indicated that Lugo was unwilling to do so, to which the court remarked: "[E]ven if the witness were available, it would be having the jury to determine whether or not a battery took place in 2005 that could then reflect on Mr. Romero in 2014; so that seems to be a lot of litigation for a very small issue, especially in light of his other impeachment."

During trial Romero testified that he had suffered felony convictions in 2003 and 2012 for possession of a firearm by a felon. He admitted that he served four years in federal prison and had been involved in a street gang since he was a teenager. Romero left the gang and his former gang had given the "green light[]" for him to be killed. He further testified that he abused drugs in the past and was under the influence of LSD and PCP when he gave his statement to the police about the murders. At various points during his testimony, Romero recanted the statements he made to the police; he said he felt pressured by the detectives and therefore lied to them. Romero denied that Lugo had

5

confessed to the murders and stated that he was merely passing along rumors he had heard on the street. At other points during his testimony Romero claimed he could not remember his police interview, did not know the truth and could not remember his testimony from the preliminary hearing. He explained that he was currently taking medication for anxiety which caused memory lapses.

The jury convicted Lugo of the two counts of first degree murder and found the enhancements and special circumstance true. The court imposed consecutive terms of life without the possibility of parole together with 25 years to life for the gun enhancement for each count. Lugo timely appealed.

## DISCUSSION

I.    *The Trial Court Did Not Err When it Denied Lugo's Request to Impeach Romero With His Prior Misdemeanor Conduct.*

Lugo asserts the trial court violated his federal Sixth Amendment right to confront witnesses, his due process right to present a defense, and his state law right to cross-examine witnesses when it denied his request to impeach Romero's testimony with his prior misdemeanor conduct.

A.    *Constitutional Claim*

The Sixth Amendment's Confrontation Clause guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678.) As the Court stated in *Davis v. Alaska* (1974) 415 U.S. 308, 315, "[c]onfrontation means more than being allowed to confront the witness physically." The Court recognized that "the cross-examiner is not only permitted to delve into the witness'[s] story to test the witness'[s] perceptions and memory, but [also] . . . allowed to impeach, i.e., discredit, the witness." (*Id.* at p. 316, italics omitted; accord *People v. Quartermain* (1997) 16 Cal.4th 600, 623 [recognizing the right of confrontation under the Sixth Amendment "includes the right to cross-examine adverse witnesses on matters reflecting on their credibility"].)

6

"However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation." (*People v. Chatman* (2006) 38 Cal.4th 344, 372.) "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20.) A trial court, therefore, has discretion to limit or exclude impeachment evidence when the evidence is repetitive, prejudicial, marginally relevant, time consuming, or is likely to confuse the issues. (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679; *People v. King* (2010) 183 Cal.App.4th 1281, 1316.)

In addition, the trial court's discretionary exclusion of impeachment evidence does not violate the Sixth Amendment unless the prohibited cross-examination might reasonably have produced "a significantly different impression" of the witness's credibility. (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 350 ["The determination whether a defendant has been denied the right of confrontation is focused on the individual witness. The standard for determining if a [C]onfrontation [C]lause violation has occurred is whether a reasonable jury might have received a significantly different impression of the witness's credibility had the defendant been permitted to pursue his proposed line of cross-examination"].) The burden rests on the defendant to make this showing. (*People v. Williams* (1997) 16 Cal.4th 153, 207.)

Preliminarily, the Attorney General argues that Lugo forfeited the claim by failing to raise it in the trial court. Because Lugo has not cited to the appellate record, nor does he claim, that he asserted a federal constitutional objection to the court's ruling, he has forfeited the claim. (See Evid. Code, § 353; *People v. Redd* (2010) 48 Cal.4th 691, 730 & fn. 19; *People v. Thornton* (2007) 41 Cal.4th 391, 427; see also *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314 [holding the right to confrontation may be forfeited].) In any case, the claim lacks merit.

As the trial court observed, the misdemeanor conduct from 2004 and 2005 was relatively old, compared to his 2012 felony conviction. Further, although Lugo's counsel

7

was aware of Romero's prior misdemeanor convictions before the preliminary hearing, she had not developed the evidence to prove the conduct in time for trial. Thus, if Romero had denied that he committed the misdemeanor conduct, the trial would have had to be delayed for counsel to obtain further proof. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 297, fn. 7, 300 & fn. 14 [holding impeaching conduct must be proven by direct evidence of the acts committed, i.e., a witness could admit the conduct or witnesses could be called to describe the conduct], superseded by statute on another point in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459-1460; cf. *People v. Clark* (2011) 52 Cal.4th 856, 931 [under Evid. Code, § 788, a witness may be impeached with the record of judgment establishing a felony conviction].)

Furthermore, Lugo has not demonstrated that the prohibited cross-examination about Romero's prior misdemeanors would have produced a significantly different impression of his credibility. The jury heard that Romero suffered two felony convictions for gun possession, spent four years in federal prison, had been an active and violent gang member, abused drugs and engaged in criminal activities with his co-workers. He admittedly lied to the police about where he obtained his gun and misled authorities about the murders during his police interviews. Romero also conceded he was impaired during the police interviews; he could not recall his statements to police. He repeatedly gave vague and inconsistent versions of Lugo's purported confession; and Romero's testimony at the preliminary hearing and at trial was riddled with contradictions. At trial he claimed that he was heavily medicated. Lugo's trial counsel thoroughly cross-examined Romero regarding all of these matters. Romero's inconsistent testimony and prior statements about the murders coupled with his demeanor and criminal background provided Lugo with ample material to discredit Romero. The evidence of Romero's misdemeanor conduct was not likely to have produced a different impression of Romero's credibility, let alone, a significantly different impression. The trial court's exercise of discretion to exclude it did not violate the Sixth Amendment. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 494.) Therefore, even if Lugo had preserved his constitutional claim for appeal it would fail.

8

B.      *State Law Claim*

Appellant does not challenge that under California law, a witness may be impeached with evidence of conduct that involves moral turpitude, including conduct that results in a misdemeanor conviction, but may not be impeached with evidence of the misdemeanor conviction itself.   (*People v. Wheeler*, *supra*, 4 Cal.4th at pp. 295-296 & 299; see also *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1522.)  The parties also agree, as do we, that proof of the conduct underlying Romero's misdemeanor convictions—corporal injury on a spouse or cohabitant (Pen. Code, § 273.5), criminal threats (Pen. Code, § 422), and vandalism (Pen. Code, § 594) is relevant to show moral turpitude for the purposes of impeachment.  (E.g., *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402 [violation of Penal Code section 273.5 connotes readiness to do evil, and thus, impeachment with evidence of [the facts of the] crime is proper]; *People v. Thornton* (1992) 3 Cal.App.4th 419, 424 ["section 422 is a crime of moral turpitude," for the purposes of impeaching a witness]; see *People v. Campbell* (1994) 23 Cal.App.4th 1488, 1493 [concluding misdemeanor vandalism is a crime of moral turpitude].)

Notwithstanding relevance, the "trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code section 352."  (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 207; accord, *People v. Clark*, *supra*, 52 Cal.4th at p. 931.)  Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.  (See Evid. Code, § 352.)

The court's decision to exclude the misdemeanor conduct in this case complied with Evidence Code section 352.  The evidence would add only minimally, if at all, to the impeachment of Romero but would have required an undue consumption of time because the evidence of each crime would have had to be presented through witnesses to the events.  Lugo, however, asserts that, at the very least, the trial court should have permitted him to inquire directly of Romero about the conduct.  He argues that if Romero admitted the acts, then he would not have needed other witnesses or evidence, and the

9

trial would not have been unduly delayed.  Although, an admission by Romero would have resolved the need for additional proof, the court also ruled that even if the evidence was readily available, it would exercise its discretion to exclude it because the evidence lacked sufficient probative value, being both remote and adding little, if anything, to further discredit the witness.  We agree.  The probative value of this proffered evidence was, at most, minimal given the discrediting testimony from the witness himself.  The trial court, therefore, did not abuse its discretion by excluding the evidence of the misdemeanor conduct.

Regardless, any error was harmless.  The evidence against Lugo was strong.  Eyewitnesses placed Lugo at the scene of the crimes before, during and after the murders.  DNA evidence placed him inside the victims' apartment and the victim's vehicle.  In view of this evidence, absent the alleged error—the exclusion of Romero's misdemeanor conduct—it is not reasonably probable that Lugo would have received a more favorable result.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

II.     *The Trial Court Must Amend the Minute Order to Reflect the Oral Sentence.*

At the sentencing hearing, the trial court ordered Lugo to pay a criminal conviction assessment of $60 under Government Code section 70373, reflecting that the jury convicted Lugo of two felonies.  The abstract of judgment properly reflects the imposition of the assessment, but the July 25, 2015 minute order from the sentencing hearing reflects a criminal conviction assessment of $70.  Lugo argues, and the Attorney General concedes, and we agree, that the minute order must be corrected to conform to the oral sentence.  (See *People v. Scott* (2012) 203 Cal.App.4th 1303, 1324 [errors in minute order are subject to correction where they deviate from oral pronouncement of the judgment].)

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the July 25, 2014 minute order to reflect a total criminal conviction assessment of $60 under Government Code section 70373.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

JOHNSON, J.

LUI, J.

11